UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| SCIMECA FOUNDATION, INC. | : | |
| Debtor | : | Bankruptcy No. 10-13662 |

.................................................

MEMORANDUM

.................................................

The chapter 7 trustee, Gary F. Seitz, has filed a motion seeking court approval to sell the debtor's real and personal property free and clear of liens.  In connection with this sale, the trustee seeks approval of an agreement with a secured creditor, Ciena Capital Funding LLC, which settles the trustee's potential claim under 11 U.S.C. § 506(c) and includes authorization to pay from the sale proceeds all normal costs of sale, including real estate commissions, as well as "undisputed liens."  Furthermore, as part of the sale order, the trustee seeks to terminate five alleged leaseholds held by the debtor's principal, Peter DeFeo, and by an entity owned and/or controlled by him, International Artist Studio (IAS), and to order these two tenants to vacate these leaseholds.[1]

The trustee's motion is opposed by the debtor, by Mr. DeFeo, and by Creek Road Funding LLC, which is another entity owned and/or controlled by Mr. DeFeo.  The trustee's motion is supported by Ciena Capital and by South Street Head House District.  The City of Philadelphia has no objection to the trustee's request to sell the debtor's

---

[1]At the conclusion of the hearing, the trustee withdrew his request for an order subordinating certain tax claims under 11 U.S.C. § 724.

property free and clear of liens, nor to pay undisputed lien claims, so long as the trustee
places funds from the sale proceeds in escrow equal to the City's disputed claims.

An evidentiary hearing took place over five days, with all parties in interest
participating.  Mr. DeFeo elected to represent himself, agreeing to his counsel's request to
withdraw made at the start of the hearing.  The parties have submitted post-hearing
memoranda, which have been reviewed.[2]

The following facts were either not disputed or were proven.

I.

A.

The debtor filed a voluntary petition in bankruptcy under chapter 11 on May
3, 2010.  Its sole assets are real and personal property located at 517-529 South 4th Street,
Philadelphia, Pennsylvania (the Foremost Building).  At the time of its bankruptcy filing,
and thereafter, the debtor leased its realty to commercial tenants on its ground and
basement (the "Mall") floors, and office space on the second through fourth floors.  There
appears to be space used as an apartment on the fifth floor.

---

[2]Mr. DeFeo's memorandum attached documents which were not introduced in
evidence at the hearing and alleged facts also not proven at the hearing.  Those documents and
allegations cannot now be considered, as the trustee and Ciena had no opportunity to challenge
their authenticity or admissibility, cross-examine witnesses regarding those documents, or offer
rebuttal evidence.  See, e.g., In re Millman, 2003 WL 716289, at *3 n.12 (Bankr. E.D. Pa. Feb. 3,
2003); In re MacDonald, 222 B.R. 69, 72 (Bankr. E.D. Pa. 1998); In re Midway Airlines, Inc.,
221 B.R. 411, 462-63 (Bankr. N.D. Ill. 1998); Matter of Holly's, Inc., 190 B.R. 297, 301 (Bankr.
W.D. Mich. 1995).

The debtor identified Mr. DeFeo as its president and the only individual or entity with an equity interest in the debtor.  See docket entry #14.

On its Bankruptcy Schedule A, the debtor valued its real estate in the amount of $9 million.  See docket entries ##19, 35.  On its Bankruptcy Schedule B, the debtor averred that it owned "various pictures on the wall" worth $500, miscellaneous tools and office equipment worth $2,000, cash on hand of only $1,800, and $300,000 in unpaid rent from its tenants.  Id.  It only disclosed seven creditors holding unsecured claims, none of which were listed as disputed or contingent.  Except for the unsecured claim of Mr. DeFeo, listed on Bankruptcy Schedule F at approximately $564,000 for "sales, management and construction maintenance," no other unsecured creditor was scheduled by the debtor as owed more than $15,000, none were affiliated entities of the debtor, and the non-DeFeo claims totaled about $45,000.  See docket entry #19.

The debtor later filed an amended Schedule F, listing only two unsecured creditors beside Mr. DeFeo, both of which it asserted now held disputed claims totaling $27,000.  See docket entry #35.  The debtor also filed a list of leases and executory contracts, Schedule G, which list did not include Mr. DeFeo or Industrial Artist Studio as lessees.  See docket entry #19.

At the time of its bankruptcy filing and at all relevant times thereafter, the debtor's real property was encumbered by a mortgage held by Ciena Capital Funding, LLC, f/k/a BLX Capital, LLC.  The debtor filed its voluntary petition to stay a May 4, 2010 sheriff sale scheduled by Ciena.  See docket entry #37 (Amended Statement of Financial Affairs #4).

3

In August 2010, the debtor and Ciena entered into a stipulation in which the debtor acknowledged that in January 2006 it borrowed $2.75 million from Ciena secured by its real estate, by all tangible and intangible personal property, and by an assignment of rents and leases.  See docket entry #46 (Stipulation dated August 2, 2010).  This loan was guaranteed by Mr. DeFeo.  Id.  Ciena later assigned its loan interest to HSBC Bank USA, N.A., but has been acting as agent for the assignee throughout this bankruptcy case.  Id.[3]

The debtor also stipulated that the debtor defaulted in loan payments to Ciena in November 2008,[4] as well as defaulted under its loan documents owing to its failure to tender payments for property taxes and insurance.  Id.  In March and November 2009, as well as in March 2010, Ciena sent notices to the debtor's tenants exercising its assignment of rents.  Id.  Ciena also obtained a prepetition confessed judgment against the debtor in the amount of approximately $3.2 million.  Id.

This August 2010 stipulation included Ciena's authorization for the debtor's limited use of its cash collateral— i.e., rent payments—in return, inter alia, for a promise of specified future loan payments, and the debtor's obtaining and retaining property insurance.  It also fixed a deadline for the debtor's filing of a chapter 11 plan. Id.

As alluded to above, at the time of its bankruptcy filing the debtor was delinquent in taxes to the City of Philadelphia, which asserted a first priority municipal

---

[3]Throughout this case, all parties have referred to the debtor's mortgagee as Ciena, and I have done so as well.

[4]Mr. DeFeo has asserted that the debtor's financial problems stem largely from the loss of a long-time retail tenant, TLA Video.  I note that TLA Video, which paid $8,000/mo in rent, was a tenant through 2009.  See ex. T-12.

lien on the realty.  See 53 P.S. § 7102.  The City has filed numerous proofs of claim in this case.

On October 4, 2010, the United States Trustee filed a motion to convert or dismiss this case pursuant to 11 U.S.C. § 1112(b).  This motion alleged, among the grounds for relief, that the debtor was unable to effectuate a plan of reorganization and that the debtor had caused unreasonable delay that was prejudicial to its creditors.  The U.S. Trustee's motion was opposed by the debtor and by Mr. DeFeo (acting pro se).

After various postponements requested by the parties, an evidentiary hearing was held and the U.S. Trustee's motion to dismiss or convert was conditionally denied for reasons stated in an order dated March 11, 2011, with the debtor given a confirmation deadline of July 11, 2011.  See generally 11 U.S.C. § 1112(b)(4)(J); In re Hoyle, 2013 WL 210254, at *9 (Bankr. D. Id. Jan. 17, 2013).  The debtor ultimately filed an Amended Disclosure Statement and Third Amended Plan dated June 7, 2011.  See docket entry #137 (Third Amended Plan).

As part of its chapter 11 reorganization efforts, the debtor and the City of Philadelphia entered into a stipulation to resolve the debtor's objections to various proofs of claims filed by the City.  This agreement, dated July 11, 2011, required, inter alia, that the debtor pay the City $20,000 immediately, pay $12,972.98 within 30 days of the entry of a confirmation order, and pay various other amounts as part of any confirmed chapter 11 plan.  The stipulation further provided that the City held secured claims in the amounts of $92,772.69 and $5,076.85 for delinquent real estate taxes, plus priority tax claims in excess of $46,209.22.  See docket entry #156.

On August 2, 2011, the debtor's Third Amended Plan, as modified, was confirmed. The confirmation order, inter alia, incorporated the debtor's aforementioned stipulation with the City. The confirmed plan provided that the debtor would fund its required plan payments from future rental income; alternatively, the plan provided for the sale or refinancing of its real property by a date certain if the debtor's rental income was insufficient to meet its plan obligations. See docket entries ##137, 171, 172.

On October 28, 2011, the City filed a pleading asserting that the debtor had failed to tender funds promised in its stipulation and confirmed plan. See docket entry #203. On December 16, 2011, the City filed a motion to convert this case to chapter 7 under 11 U.S.C. § 1112(b)(4)(N), owing to the debtor's failure to comply with the terms of its confirmed plan, which motion the debtor opposed. See docket entries ##213, 216. Ciena supported the motion to convert averring, in part, that it also had not been paid according to the terms of the confirmed plan. See docket entry #215.

At the hearing on the City's motion to convert, the debtor conceded that it had not tendered to the City the funds owing under the terms of the confirmed plan. It argued, however, that this failure triggered the plan provision affording it until April 30, 2012, to sell or refinance its realty and pay all creditors, including the City and Ciena.

By order dated February 23, 2012, the City's motion to convert was conditionally denied based upon the debtor's confirmed plan commitment to sell its real estate or refinance its secured debt by April 30, 2012. See docket entries ##227, 228. On April 30, 2012, the debtor filed a motion for approval to sell its real estate to an entity called Foremost Acquisition Partners, LP. See docket entry #245.

6

Under the terms of this agreement of sale dated April 24, 2012, the prospective buyer agreed to pay $6.1 million for the debtor's real and personal property. The sale agreement included, among its provisions, that the purchaser had a 45-day due diligence period, which could be extended 30 days, and a warrant that the seller's rent roll and leasehold information was accurate. See docket entry #245 (Ex. A). During the due diligence period, the buyer had the right to terminate the agreement for "any reason or no reason at all . . . in [the] Buyer's sole and absolute discretion." See id.

In response to the debtor's sale motion the City, as well as Ciena, agreed to postpone further consideration of the City's motion to convert until June 11, 2012, despite the April 30, 2012 plan deadline. On June 4, 2012, the debtor withdrew its motion to sell its realty, giving no reasons for doing so.[5]

On June 1, 2012, the debtor filed an expedited motion to approve a refinancing agreement under 11 U.S.C. § 364(b). See docket entry #253. The debtor sought court approval to borrow $3,780,000 from an entity known as Financial Funding LLC, with the prospective borrower receiving a first priority lien on the debtor's realty. The debtor averred that this refinancing would be sufficient to repay all claims in full. See id.

On June 11, 2012, the debtor's refinancing motion was conditionally approved under section 364, after a hearing at which time no party objected, even though the debtor did not attach a loan commitment document to its motion nor specify the precise terms of the loan; moreover, any such refinancing would occur beyond the plan

---

[5]The debtor never asserted that the prospective purchaser breached its agreement of sale. Thus, I assume that the prospective purchaser opted not to complete the sale after its investigation into the debtor's financial affairs was complete.

deadline.  The order approving refinancing noted that the debtor stated in open court that

the refinancing was scheduled to close on June 28, 2012 at the offices of Financial

Funding, LLC.  See docket entry #262.  Despite being granted various extensions to do

so, the debtor was unable to close on the authorized refinancing.[6]

The City of Philadelphia then renewed its motion to convert the case to

chapter 7.  Upon further hearing, this motion was granted on August 7, 2012 to take effect

on August 17, 2012.

On August 16, 2012, the debtor and the City filed a settlement which

resulted in the City agreeing to withdraw its motion to convert and to the vacating of the

conversion order.  This settlement provided, in relevant part, that the debtor tender

specified sums to the City on or before August 16th.  See docket entry #297.

Although not known until many months later, the debtor did not have

sufficient funds to meet its payment obligation to the City under this new settlement

agreement.  Instead, on or about August 2012, Mr. DeFeo created a new entity called

Creek Road Funding, LLC.  He is its only member and so is its managing member.

Beginning on August 8, 2012 and ending on October 10, 2012, Mr. DeFeo signed, on

behalf of both the obligor and obligee, six promissory notes he prepared purporting to

obligate Scimeca to pay Creek Road the following amounts: $5,000, $15,000, $5,500,

$5,000, $42,000, and $5,000 respectively.  See docket entry #477.  None of these

promissory notes contained any provision securing the note with collateral.  In addition to

these notes, Mr. DeFeo on behalf of Scimeca, signed a "demand note" in favor of Creek

---

[6]Again, the debtor never asserted that the failure of Financial Funding LLC to
close the loan violated any lending commitment.

8

Road in the amount of $300,000, dated August 15, 2012. This note also made no

reference to any security interest. Id.

       Neither Mr. DeFeo nor Creek Road recorded any security agreements

against the debtor, nor did the debtor seek court approval to borrow any funds pursuant to

11 U.S.C. § 364. Furthermore, neither the debtor, Creek Road nor Mr. DeFeo provided

any notice to parties in interest as to the source of the funds used to pay the City's claims.

       On August 16, 2012, Creek Road issued a cashier's check in the amount of

$187,201.31 made payable to Mr. DeFeo, who endorsed this check to the City to satisfy

the debtor's obligations under the August 2012 settlement agreement. See docket entry

#477. As a result, as mentioned above, on August 16, 2012, the City withdrew its motion

to convert this case to chapter 7 and requested that the earlier conversion order be

vacated, which request was granted.

       Thereafter, owing to its insufficient income, the debtor again failed to

comply with the terms of its confirmed plan, and secured creditor Ciena filed its own

motion to convert the case to chapter 7. On November 6, 2012, that motion was granted

and the case was converted to chapter 7. See docket entry #335. After conversion, the

debtor did not file any schedule of executory contracts and unexpired leases entered into

or assumed after the commencement of the chapter 11 case and prior to its conversion.

See Fed. R. Bankr. P. 1019(5)(C)(iii).

       Upon his appointment as chapter 7 trustee, Mr. Seitz sought court approval

to operate Scimeca's business under section 721 and to enter into a building  management

agreement with Star Real Estate Group, Inc. and its principal, Richard Astrella. By order

dated November 19, 2012, the trustee's motion was granted and he was authorized to

operate the debtor's business for 120 days.  See docket entry #360.

      The trustee also sought to engage Star Real Estate Group, Inc. as exclusive

listing agent for the sale of the debtor's commercial real estate, to be paid a 5%

commission upon its sale.  The debtor filed an objection thereto, asserting that "the

Debtor [i.e., Peter DeFeo] had been in negotiations with Michael Untermeyer to sell the

real property . . . [and] [t]hose negotiations resulted in an offer to purchase tendered

by Michael Untermeyer to the Debtor, which the Debtor believes is in the best interest of

the Debtor and all of its creditors."  Docket entry #359.  In other words, the debtor

opposed the trustee's engagement of Mr. Astrella and Star Realty as exclusive sales agent,

because Mr. DeFeo maintained that he had already negotiated a bona fide sales agreement

for the Foremost Building.

      In granting the trustee's request to engage Star Real Estate Group on an

exclusive basis and overruling the debtor's objection thereto, I quoted from and

summarized relevant terms of this proposed sale agreement as follows:

> And this agreement, dated December 24, 2012, proposes that
> the debtor's real estate be purchased by 517 S. 4th Associates,
> L.P., which is identified in the agreement as: "a newly-formed
> Pennsylvania limited partnership.  Ownership to be 50/50
> between Peter de Feo (or an entity owned and controlled by
> Peter de Feo) and Michael Untermeyer."  Id., ex. 1, at 5.
> Moreover, both the purchasing limited partnership, as well as
> the debtor, are entitled to lease suites of 1,200 square feet,
> without payment of rent.  Id.  Thus, Mr. deFeo, on behalf of
> the debtor, has negotiated the sales agreement in which he has
> an interest in the proposed buyer, and would provide his
> entities with rent-free space,
>
> And the purported sales price is $6.1 million.  However, one
> condition of sale is that the buyer obtains financing on the

10

following terms: Buyer agrees to use reasonable diligent
efforts to obtain acquisition financing as follows:

(i) institutional in amount of $4,750,000 or 75% of appraised
value as determined by lender (with the Purchase Price
reduced to such appraised value if lower than $6,100,000;
provided, however, if the appraised value is less than
$5,100,000, then Seller may terminate this Agreement unless
Buyer agrees to use $5,100,000 as the Purchase Price);
nonrecourse; 20 year amortization, 20 year term; maximum
interest rate of 4.8%; security of first mortgage on Property;
and

(ii) Seller financing in amount of 12.5% of Purchase Price;
nonrecourse; monthly payments of interest only, 10 year term;
interest rate of 4.0%; security of pledge of interests of
Michael Untermeyer in entity which owns the Property.

And based upon the provision quoted above, the $6.1 million
sales price can be reduced to $5.1 million, the only source of
recovery for the lender were the loan to be in default is the
debtor's realty, as the loan must be non-recourse, 12.5% of
the sale's price would not be paid to the estate but would be
financed by the debtor, the loan to value ratio must be 75%,
and the interest rate cannot exceed 4.8% for a 20-year loan,

And the "Buyer may terminate [the sales agreement] if it is
unable to obtain such financing on or before the Due
Diligence Date or if the lender, without the default on [sic]
Buyer under the loan commitment, fails to close the loan."
Id.,

And, in addition, the proposed agreement provides that "[Mr.]
De Feo (or his entity) [shall] make a cash capital contribution
to the partnership of 12.5% of the Purchase Price using
proceeds of the sale of the Property." Id., ex. 1, at 5. Thus,
an additional 12.5% of the purchase price is unavailable to the
bankruptcy estate. Apparently, any prospective lender would
have to agree that the principals of the buyer would not need
to invest any of their funds toward the purchase price besides
their deposit,

And the prospective buyer would only need to deposit a total
of $50,000 toward the purchase price, less than 1%, made in
two $25,000 installments (with one installment to be made
after the buyer's "due diligence" date has passed), id., ex. 1, at

11

1, and loss of this deposit is the seller's sole remedy were the
buyer to breach the agreement. Id., ex. 1, at 8.  If the seller
were to breach the agreement, then the buyer may seek
specific performance or damages up to $45,000.  Id., ex. 1, at
9,

. . . Furthermore, this agreement calls for a "break-up" fee
payable to the buyer of up to $100,000 if a competing bid is
approved.  Id.,

And under this agreement, the buyer is given a 45-day period
within which it is free to terminate the agreement for no
reason and obtain a return of its deposit:

See docket entry #396 (referring to docket entry #390 (ex. 1)).

Based upon its terms and conditions, the chapter 7 trustee concluded (and I

agreed) that this December 2012 proposed sale agreement was not in the best interests of

the bankruptcy estate and so he did not accept this proposal.  Instead, he instructed Mr.

Astrella to market the realty and its contents for sale.  Before doing so, however, the

trustee obtained an appraisal from the firm of Lukens & Wolf.

This appraisal, ex. T-7(2), valued the debtor's realty at $3.8 million as of

December 26, 2012, less than two months after the trustee was appointed.  In reaching

this estimate of value, Lukens & Wolf concluded that an income capitalization approach

based upon the continued use of the second through fifth floors of the building for

commercial office space would not be the highest and best use of the realty.  The current

monthly income stream was too low and thus a potential buyer would assume that almost

$800,000 worth of time and expenses would be needed to achieve a stabilized income of

approximately $570,000.  Ex. T-7(2) (Appendix).

Instead, Lukens & Wolf concluded that office space should ultimately be

converted to condominium and/or apartment units to maximize its income:

12

> Considering the subject's location, as well as the recent trend suggesting office tenants are moving to higher quality space, the subject has significant competition from other office buildings. It is our opinion that the subject will struggle to attract office tenants due to the amount of superior vacant space available.
>
> With the surge of population moving back to Center City Philadelphia, it is our opinion that the subject is well suited for conversion to a multi-family use on the upper floors.

Id., at 9.

Testimony from a certified, licensed, MAI appraiser, Richard Hideck of Lukens & Wolf, described the debtor's realty as a Class C commercial building, which had been and was unlikely to attract high-quality tenants. The downtown Philadelphia area in which the Foremost Building is located has a three percent vacancy rate for multi-family units compared with an office vacancy rate of about 15 percent. Mr. Hideck opined that this higher office vacancy rate, along with the condition of the building—it is an older building with deferred maintenance and limited amenities—restricts the quality of tenants willing to lease space in the debtor's realty. Thus, in his opinion, the income capitalization approach would warrant a 10% capitalization rate. Id.

After concluding that an income capitalization approach using the upper floors as office space would not fairly value the Foremost Building, Lukens & Wolf determined that the comparative sales method provided the most accurate estimate of value. Ex. T-7(2), at 27. After analyzing seven sales in downtown Philadelphia, Lukens & Wolf concluded that the debtor's realty, which it believed contained about 51,000 square feet worth $74.62/sq. ft., was valued at $3.8 million as of December 2012. Id., at 38.

At the trustee's direction, and influenced by the Lukens & Wolf appraisal, Mr. Astrella, who is a licensed real estate broker, began to market the Foremost Building in February 2013 for $4.5 million, listing it on the Trend website used by real estate agents and brokers, and placing an advertisement in the Wall Street Journal. The trustee also listed the property on a website used by chapter 7 bankruptcy trustees nationwide, as well as the LinkedIn website. Approximately 80 prospective purchasers expressed some degree of interest, and there were about 25 separate showings of the building for prospective purchasers. These prospects were also provided with information including a marketing brochure, a building rent roll and building floor plans. Prospective purchasers were also requested to sign a confidentiality agreement and were told that the owner of the building was in bankruptcy; thus, the sale of the building would be conducted by the trustee.

These marketing efforts yielded 4 to 5 serious prospective purchasers who visited the realty, hired their own building inspectors and appraisers, and conducted their own due diligence. Only two written offers were received.

In January 2013, the trustee received a written offer from Mr. Untermeyer (who had been part of the December 2012 proposal mentioned above) in the amount of $4.377 million, with a $25,000 deposit to be made pending a 60-day due diligence period. Ex. D-17. The offer, dated January 17, 2013, contained among its provisions a condition that the rent rolls and building expense disclosures attached to the agreement be accurate

to within 2%,[7] and that the purchaser obtain non-recourse financing in the amount of $3,501,600 (stated to be 80% of the anticipated appraised value[8]), with an interest rate not to exceed 4.8%, with a 20-year amortization.  Id., §§ 6, 17.  Moreover, if the lender obtained an appraisal for less than the proposed purchase price of $4.377 million, then the purchase offer would be reduced to this lower appraised value.  Id., §17.

As the offer was unaccompanied by a lending commitment or financing pre-approval, the trustee found this proposal unacceptable, but made a counterproposal to which Mr. Untermeyer made no response.

In April 2013, through the brokerage firm of Coldwell Banker Preferred, Philip Harvey submitted a written proposal to purchase the debtor's realty and personal property located therein for $4 million, placing a $100,000 cash deposit with the trustee.  See ex. T-5.  This offer had no financing contingency and Mr. Harvey testified that he has sufficient funds on hand to complete the sale.  He has completed his due diligence, demanding that an old oil tank be removed—which the trustee has done—and is prepared to close.  One condition to closing, however, is that trustee "terminate all leases and occupancy by the prior owner, Peter Defoe [sic] prior to settlement."  Ex. T-5, at 9.[9]  Mr.

---

[7] Exhibit D-17 contained no such attachments.  As will be discussed, to the extent Mr. Untermeyer obtained rent roll information from Mr. DeFeo, that information was likely not accurate within 2%.

[8] Thus, Mr. Untermeyer's offer assumes that the debtor's realty would be appraised in the amount of $4,377,000 or more, but recognizes that a lender's appraisal may be lower, and so his final offer would be lower.

[9] The trustee testified, without objection, that he later learned that an appraisal was conducted for Mr. Harvey that valued the realty at $4.0 million.  If improvements were made, the appraiser projected the property value in 2015 would be $4.6 million.

Harvey acknowledged that, upon purchase, he intended to continue to rent office space on the property's upper floors rather than convert that space to residential use.

The Harvey agreement was accepted by the trustee, expressly subject to bankruptcy court approval and the right of the trustee to seek higher and better offers, with the possibility of an auction occurring if a competing bid were received.  Id., at 15.

After conditionally accepting Mr. Harvey's offer, the trustee continued to market the property.  He sent out information to all those who had expressed an interest in the realty, explaining his conditional acceptance of the $4 million offer and the ability of third parties still to make higher offers for the property.  He also described a bidding process for resolving competing offers.  Although the trustee received a few oral inquiries, no competing bids were made.[10]

Moreover, the trustee also communicated with a broker that specializes in cell tower leases, hoping to lease the roof space of the Foremost Building.  Although the trustee received a few queries, no cell phone tower lease offers have been made.

Since the debtor's rental income constituted Ciena's cash collateral, the trustee reached an accord with Ciena that would allow him to continue to operate the building, pay necessary expenses, market and sell the building.  Ex. T-8.  He testified credibly that after paying normal operating expenses, he used rental income to resolve local Housing Code citations involving the debtor's fire alarm system, the sprinkler system and its electrical and plumbing systems, as well as made roof repairs and removed

---

[10]After receiving information, presumably from Mr. Harvey, that Mr. Untermeyer approached Mr. Harvey about bidding jointly for the property, the trustee sent notice warning against any collusive bidding.  Ex. D-2.  The trustee is convinced that Mr. Harvey has acted in good faith and no evidence was presented to the contrary.

16

an old oil tank in the basement.  He also authorized expenditures to evict delinquent

tenants.

       The trustee believed those expenditures were more important to the prompt

sale of the realty than seeking Ciena's approval to spend the debtor's post-operating cash

to attract new tenants.  He also opined that continued maintenance costs were diminishing

cash flow, and thus a prompt sale to Mr. Harvey, who (unlike the bankruptcy estate) has

the ability to make a capital influsion, was more reasonable than his delaying the sale

while trying to increase the rental income.  Indeed, the trustee was concerned that if he

did not promptly sell the building, Ciena might oppose his continued use of its cash

collateral and he might need to close the building.

       The trustee did not invest all the monthly cash flow to improve lease space

for prospective tenants.  Instead, as of the date of the sale hearing, he had preserved about

$104,000 as a portion of funds needed to complete the administration of the case,

including the payment of chapter 7 expenses of administration.[11]

B.

       The debtor offered evidence from RMS Commercial Group, LLC

regarding appraised value.  Testimony regarding the RMS appraisal report was offered by

Bruce E. Jones, a licensed commercial appraisal who also holds the MAI designation.

Ex. D-16.  In connection with the debtor's unsuccessful effort to refinance its property in

---

[11]In his post-hearing memorandum, at 10 (unpaginated),  the trustee complains
that the substantial chapter 7 administrative expenses are due in large part to the repeated
objections filed by the debtor and Mr. DeFeo to motions filed by the trustee in this case.

17

June 2012, RMS had earlier appraised the realty at $6.3 million.  The updated report,

which was done without an additional site visit, valued the realty as of August 1, 2013,

also at $6.3 million, which value was the average of the sales comparison and income

capitalization approaches, although Mr. Jones opined that the capitalization approach was

the more persuasive method.

   The RMS appraisal considers the debtor's realty to be a Class B building

whose highest and best use is to continue to rent commercial office space, and ground

floor plus basement retail space.  Relying upon rent roll and expense information

provided by Mr. DeFeo, not the chapter 7 trustee, RMS opined that a prospective

purchaser would estimate that the debtor would have an 85% occupancy rate, and receive

annual net operating income of $447,222.  Choosing a capitalization rate of 7.75%, RMS

opined that  this anticipated annual income would be valued at $5,770,612.  Ex. D-16, at

V-5.  RMS then added $390,000 as the value for an anticipated cell phone tower lease,

yielding a total capitalization valuation of  $6.2 million.  Ex. D-16, at V-5.

   In comparing the two appraisals offered in evidence, certain relatively

minor differences in the use of the income capitalization approach are readily apparent.

For example, the Lukens & Wolf appraisal opined that the rentable basement space was

9,500 square feet, valued at $5/sq ft, while RMS estimated it at 10,400 square feet, valued

at $10/sq ft.  The trustee's appraisal estimated rental ground floor retail space to be

valued at $200,328 or $17.73/sq ft, while the debtor's appraisal estimated ground floor

rental space to be valued at $208,320 or $19.11/sq ft.  In addition, Lukens & Wolf valued

rental space above the ground floor valued at $21/sq ft.  RMS estimated this space to be

worth 23.08/sq ft.  Both appraisals estimated operating expenses at roughly $250,000, and

18

projected a vacancy/credit loss of about $95,000 to $100,000 annually, representing about 15% (i.e. 85% of the building occupied with rent-paying tenants).

      Other differences in the two appraisal reports are more significant.

      RMS concluded, based upon the information provided to it by Mr. DeFeo, that the debtor already has a stabilized income stream with net annual income of $447,222.  Thus, if annual operating expenses are $252,480, as RMS believed, see ex. D-16, at V-3, RMS assumed that the debtor has stabilized gross rental income of about $58,000 per month.  Lukens & Wolf opined that it would require more than $200,000 worth of expenses only to achieve a stabilized income, i.e., 85% occupancy with viable tenants.  Ex. T-7(2) (Appendix).  RMS assumed that those viable tenants were already in place.

      In further comparison between the two appraisal reports, it is clear that RMS used an income capitalization rate of 7.75%, versus Lukens & Wolf's 10% , and the Lukens & Wolf appraisal omits any value for a future cell phone tower lease.

      The evidence as to the debtor's income from rentals supports Lukens & Wolf's opinion that a stabilized income had not been achieved.  The debtor prepared a monthly rent roll dated August 5, 2013 totaling $38,912.26, and an undated rent roll that may have been sent to RMS for use in its August 2013 appraisal totaling $57,593.[12]  Exs. D-4, T-15.  The trustee's operating report for July 2013 reflects rent receipts of $34,693.  See docket entry #490.  Moreover, the debtor's last monthly operating report prior to

---

      [12]Exhibit T-14, which is undated, has a total rent roll figure of $74,643.  Included in this total is $17,100 for "Future Mall" which is noted as projection.  Thus exhibit T-14 also states that the debtor was actually receiving $53,543 in monthly rentals.  As will be discussed, RMS may well have used this document when it prepared its appraisal.

conversion, dated September 30, 2012, shows rents received in the amount of $30,144.27 during September 2012.  It also shows cumulative rent receipts since the inception of its bankruptcy case in May 2010 that average $34,105.44 per month.  See docket entry #498.[13]  Therefore, RMS's assumption that the Foremost Building already generated about $58,000 in monthly rental receipts is incorrect.

In reviewing the two appraisals, I also note that they differ in their comparative sales approaches, which is not surprising given their disagreement regarding the condition and classification of the Foremost Building and their suggested highest and best use.  They also differ markedly in their choice of comparable sales.  Surprisingly, according to Lukens & Wolf, the Foremost Building has approximately 51,000 square feet; according to RMS, it has only 39,260 square feet.

Mr. Jones of RMS did opine that he agreed that Comparable Sale #1 used by Lukens and Wolf was appropriate.  That property, located on the 700 block of Sansom Street, Philadelphia, Pennsylvania (near the Foremost Building) sold for $3,430,000 in December 2010, at approximately $73/sq. ft.  This six-story building, consisting of approximately 47,000 square feet of retail space on the ground floor and office space on its other floors, had deferred maintenance, and 80-85% occupancy rate with short or mid-term leases remaining.  Ex. T-7(2), at 29, 36-37.

---

[13]Cumulative rent receipts are listed at $989,057.76.  There were 29 months between the May 3, 2010 filing of the bankruptcy petition and September 30, 2012.

C.

Mr. DeFeo acknowledged that he or International Artist Studio (IAS),

asserts leasehold interests in five areas of the Foremost Building, as follows:

> 1.  One year lease dated February 3, 2011 with IAS for unit 244/444[14]; rent is $200 per month beginning February 2011.

> 2. One year lease dated January 8, 2010 with IAS for unit 245/445; rent is $500 per month beginning one year later on February 1, 2011.

> 3. One year lease dated December 30, 2008 with Peter DeFeo for unit 247/447; rent is $300 per month beginning January 1, [2009].

> 4. One year lease dated June 1, 2008 with "Peter deFeo t/a IAS for unit 248/448; rent is $800 per month beginning September 1, 2008.  Mr. DeFeo asserts that this lease covers unit 250/450, but the lease does not so state.[15]

> 5.  A five year lease dated January 30, 2010 with "Peter Anthony DeFeo for unit 498/598; rent is $500 per month beginning February 2010.

Ex. T-9.

All five leases were signed by Mr. DeFeo on behalf of the lessor and lessee,

and all five leases contained a provision for automatic one-year lease renewals absent 90-

day written notice, and stated that the tenant paid the last two months rent upon signing

the lease.  These leases also provided:

---

[14]On the debtor's handwritten ledger sheets, exs. T-12, T-13, virtually all rental units throughout the building, except the basement area, are numbered beginning with 401. The alternate numbers, such as 244, reflect that unit 444 is located on the 2nd floor.

[15]This lease refers only to unit 248 in the leasehold description in its text.  At some unknown point, someone added "+250" above the top portion of the form lease.  Ex. T-9.

14. If the Lessee

(a) Does not pay in full when due any and all installments of rent . . .

Then . . . at the option of the Lessor . . .

(2) The lease and the term hereby created shall, at the option of the Lessor, determine and become absolutely void, without any right on the part of the Lessee to save forfeiture by payment of any sum due.

Id.

The trustee asserts, and Mr. DeFeo does not dispute, that neither Mr. DeFeo nor IAS paid any rent to the trustee since this case was converted to chapter 7. See also ex. D-4, at 2. Mr. DeFeo further acknowledged at the hearing that the lease default provision, just quoted, was included by him in all Scimeca leases and was intended by him, as representative of the lessor, to nullify a leasehold interest of any tenant in rent default, at the option of the lessor. See Village Beer & Beverage, Inc. v. Vernon D. Cox & Co., Inc., 327 Pa. Super. 99, 108 (1984).

Upon conversion to chapter 7, by virtue of section 323 of the Code, the chapter 7 trustee became the sole representative of the estate and the proper party to manage, control and assert all rights of the debtor. See generally Donaldson v. Bernstein, 104 F.3d 547, 554 (3d Cir. 1997); Matter of Richman, 104 F.3d 654, 657 (4th Cir. 1997). Mr. Seitz now acts on behalf the debtor/lessor, and in this sale motion he has elected to nullify the leasehold interests of Mr. DeFeo and IAS. See generally Floyd v. Clark, 266 B.R. 61, 63 (E.D. Pa. 2001); McCafferty v. Davis, 74 Pa. Super. 172 (1920) (lessor's action in eviction for non-payment of rent made a written notice to quit unnecessary).

22

Nonetheless, Mr. DeFeo maintains that the trustee cannot nullify the aforementioned leasehold interests because both he and IAS prepaid their rent via lump sum payments made to the debtor prior to conversion; thus, he argues, they had no obligation to tender rent payments to the chapter 7 trustee and are not now in default of their lease obligations.  Moreover, Mr. DeFeo contends that since he and IAS are current in their rent, their leases are valid until they receive proper 90-day notices of non-renewal.

Since Mr. DeFeo had been in control of all Scimeca business records until this case was converted in November 2012, the trustee sought proof from him of these alleged rent prepayments.  See, e.g., Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 96 (2000) (where fairness so requires, burden of proof of a particular fact may be assigned to "party who presumably has peculiar means of knowledge" of the fact) (quoting 9 J. Wigmore, Evidence § 2486 (rev. ed. 1981)); Secaida-Rosales v. INS, 331 F.3d 297, 313 (2d Cir. 2003).  The debtor's bankruptcy schedules, statement of financial affairs and monthly operating reports, exs. T10-A through L, did not disclose such payments.  Indeed, as mentioned earlier, the debtor's Bankruptcy Schedule G does not even identify IAS or Mr. DeFeo as lessees.  The debtor's Amended Disclosure Statement attached as Exhibit C a June 2011 rent roll that listed no tenants for units 444 or 445, that the debtor, Scimeca, was occupying unit 450, and the name of the tenant is unit 498 was "Penthouse."  See docket entry #138 (ex. C). Moreover, the debtor never filed any amended schedules, as required by Rule 1019(5)(C)(iii), disclosing all unexpired leases entered into by the debtor in possession prior to conversion.

In response, Mr. DeFeo provided to the trustee copies of a handwritten ledger, with entries beginning in 2006, exs. T-12, T-13, along with Scimeca's federal tax

returns for 2008, 2009, 2010 (which 2010 return was signed but not filed) and 2011, exs.
T11-A through D, plus a few records reflecting deposits made into Scimeca bank
accounts.

Charles Persing, a certified forensic accountant engaged by the trustee,
testified that he analyzed the debtor's financial information filed in this case, including
the monthly operating reports, the handwritten ledger and the tax returns, and concluded
that they did not reflect prepayments for the leasehold interests now asserted.  See ex. T-
17.  Moreover, Mr. Persing notes in his report numerous inconsistencies between the
information reported on the debtor's monthly operating reports filed with this court and
the handwritten ledger sheets, which call into question the veracity of these documents.

Mr. DeFeo primarily relies upon his handwritten ledger.  Exs. T-12 and T-
13.  My review of the ledger entries reveals the following information therein as relevant
to the five leasehold interests asserted:

| unit | date of lease rent obligation | monthly rent on lease | paid in 2008 | paid in 2009 | paid in 2010 | paid in 2011 | paid in 2012 | total paid by IAS or DeFeo |
|------|-------------------------------|-----------------------|--------------|--------------|--------------|--------------|--------------|----------------------------|
| 244/444 | 2/2011 | $200 | *ledger shows no tenant* | *ledger shows tenant is Jill Lipschutz at $325/mo* | *ledger shows tenant is Jill Lipschutz at $325/mo* | ledger shows tenant is Jill Lipschutz at $325/mo | ledger shows tenant is Jill Lipschutz at $325/mo | ledger shows no payments $0 |
| 245/445 | 2/2011 | $500 | *ledger shows tenant is IAS at $1,400/m; no payments* | *ledger shows tenant is IAS with monthly rent "Inc." no payments* | ledger shows tenant is Agency Connect as of 2010 at $225/m | ledger shows tenant is Agency Connect at $225/m | ledger shows tenant is IAS at $800/m; $10,000 paid July 2012 | $10,000 |
| 247/447 | 1/2009 | $300 | ledger shows | ledger shows | ledger shows | ledger shows | ledger shows | $0 |

24

| unit | date of lease rent obligation | monthly rent on lease | paid in 2008 | paid in 2009 | paid in 2010 | paid in 2011 | paid in 2012 | total paid by IAS or DeFeo |
|---|---|---|---|---|---|---|---|---|
| | | | tenant is "PAD" at $300/m; no payments made | tenant is PAD at $300/m; no payments made | tenant is PAD at $200/m; no payments made | no tenant and no payments received | tenant is "PAD storage" at $200/mo no payments | |
| 248/448 250/450 | 9/1/2008 | $800 for 248 only | ledger shows tenant is Reiki School at $550/mo & $330/mo | ledger shows tenant is Reiki School at $550/mo & $330/mo | ledger shows tenant is Reiki School $1,180/mo & "Inc" | ledger shows 448 tenant is IAS for $550/mo no tenant for unit 450; $92,200 credited for unit 448 | ledger shows 448 tenant is IAS for $800/mo no tenant for unit 450; $9,230 credited for unit 448 | $101,230 |
| 498/598 | 2/1/2010 | $500 | | | ledger shows tenant is "Penthouse" at $500/mo; paid $2,499 plus $6,500 marked insurance | ledger shows tenant is "Penthouse" at $500/mo; no payments received | ledger shows tenant is "PAD at $500/mo; paid $9,800 | $9,800 |

Therefore, the ledger reflects that the debtor credited to IAS payments only for units 245/445 and 248/448. No payments are credited to Mr. DeFeo, except for unit 498/598, and those credited payments were made in May and June 2012. Ex. T-12.

In addition, on January 30, 2013, Peter J. Wirs filed a motion to compel the trustee to reject his lease of unit 498/598. See docket entry #402. Attached to the motion was a copy of a month-to-month lease between Scimeca and Mr. Wirs dated November 1, 2012, for monthly rental of $990.00. Id. This motion was settled by order dated March 4,

2013, whereby Mr. Weir agreed to vacate unit 498/598 without any further obligation to
the bankruptcy estate.  See docket entry #415.

D.

Federal Rule of Bankruptcy Procedure 1019(3)—amended in 1987 to
overrule the result in decisions such as In re Crouthamel Potato Chip Co., 786 F.2d 141
(3d Cir. 1986), see, e.g., Matter of Fesco Plastics Corp., Inc., 908 F.2d 240, 242-43 (7th
Cir. 1990)—provides that, upon conversion of the case from chapter 11 to chapter 7, only
claims actually filed on the claims register will be deemed allowed.  See, e.g., In re L.
Meyer & Son Seafood Corp., 188 B.R. 315, 319 (Bankr. S.D. Fla. 1995).  After this case
was converted to chapter 7, a claims bar date of March 14, 2013 was set.  See docket
entry #369.

The claims register identifies the following unsecured claims (exclusive of
those that may have been filed by the City of Philadelphia that the trustee may dispute)
whose claims have not been challenged, may be the subject of an agreement, or whose
objection previously has been resolved by court order: Internal Revenue Service
($3,535.98); Pennsylvania Department of Revenue ($12,159.26); PECO ($63,000);
Mountain Valley Foods, Inc. ($6,150); Department of Labor and Industry ($380.91).  In
addition, Mr. DeFeo filed three proofs of claim on March 14, 2013, objections to two of
which were sustained by court order dated August 12, 2013.  Thus, one claim for $77,000
remains.

26

The chapter 7 trustee has reached an accord with secured creditor Ciena, which he asks this court to approve, ex. T-8, by which Ciena will reduce by an amount stated in open court— $469,154.87—any distribution it will receive on its allowed secured claim.  This reduction or "carve-out" will permit all chapter 7 and chapter 11 administrative expenses to be paid from the proceeds of sale, along with approximately $40,000 distributed to allowed priority and general unsecured claimants.

The trustee also requests authorization to pay at the sale closing the normal costs of sale, such as real estate commissions, along with certain secured claims, including the debtor's portion of 2013 property taxes, without the need to await a formal distribution from the bankruptcy estate.  The trustee stated in open court that he seeks approval to pay closing costs and distributions estimated by him to be $3.6 million.  He has agreed to escrow about $91,000 pending the outcome of his dispute concerning certain claims raised by the City of Philadelphia, as well as a claim by creditor South Street Head House District.

## II.

Section 704(a)(1) of the Bankruptcy Code directs that a chapter 7 trustee shall: "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest."  To aid the trustee in the liquidation of the debtor's assets, the trustee is authorized to sell property of the bankruptcy estate out of the ordinary course of the debtor's business, subject to court approval after notice and hearing.  11 U.S.C. §

27

363(b)(1); see, e.g., Flynn v. Thomas, 2010 WL 2539421, at *3 (D.N.J. June 15, 2010),

aff'd, 417 Fed. Appx. 188 (3d Cir. 2011); In re Delcora Industries, Inc., 2002 WL

32332749, at *2 (D. Del. May 20, 2002).

Court approval of the trustee's motion to sell is warranted when the trustee

has demonstrated sound business judgment in requesting the sale.  The proper exercise of

such judgment is shown when the purchase price is fair and reasonable and the sale

process has been conducted in good faith by the trustee and by the prospective purchaser.

See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986); In

re Delcora Industries, Inc., 2002 WL 32332749, at *2.  As was recently summarized in In

re Bryan, 2013 WL 4716194, at *2 (Bankr. M.D. Ala. Sept. 3, 2013):

> The Trustee's sale of estate property, and thus his acceptance
> of any bid, is governed by the business judgment test. . . .
> Essentially, this requires a trustee to establish sound business
> reasons for the terms of the proposed sale. . . .  Under this test,
> the Court considers factors such as: "(1) any improper or bad
> faith motive; (2) price is fair and the negotiations or bidding
> occurred at arm's length, (3) adequate procedure, including
> proper exposure to the market and accurate and reasonable
> notice to all parties in interest."  In re Gulf States Steel, Inc.
> of Ala., 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002).  A
> trustee's decision in executing a sale or accepting a bid "is
> entitled to respect and great deference from the Court, so long
> as the burden of giving sound business reasons is met."  Id.

(citations omitted); see, e.g., In re JFD Enterprises, Inc., 215 F.3d 1312 (table), 2000 WL

560189, at *5 (1st Cir. May 1, 2000); In re Phillips, 2013 WL 1899611, at *10 (M.D. Fla.

May 7, 2013).

In addition to meeting the business judgment standard, section 363(d)

incorporates section 363(e) into the sale process, requiring that a party with an "interest"

28

in the property to be sold be adequately protected.  See In re Continental Air Lines, Inc.,

780 F.2d 1223, 1226 (5th Cir. 1986).

> As a further aid to the disposition of assets, section 363(f) provides that :

> The trustee may sell property under subsection (b) or (c) of
> this section free and clear of any interest in such property of
> an entity other than the estate, only if--

> (1) applicable nonbankruptcy law permits sale of such
> property free and clear of such interest;

> (2) such entity consents;

> (3) such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on
> such property;

> (4) such interest is in bona fide dispute; or

> (5) such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

> As section 363(f) is written in the disjunctive, a bankruptcy trustee can "sell

property free and clear of an interest in the property provided that one or more of the

provisions under Section 363(f) is satisfied."  In re Messina, 687 F.3d 74, 77 n.4 (3d Cir.

2012); see, e.g., In re Bryan, 2013 WL 4716194, at *1; In re Bella Vista Associates, LLC,

2007 WL 4555891, at *4 (Bankr. D.N.J. Dec. 18, 2007).  In general, the effect of such a

sale is to divest the property sold of all interests so that the purchaser holds no legal

responsibility to honor those interests.  See generally Van Huffel v. Harkelrode, 284 U.S.

225, 227-28 (1931); In re Trans World Airlines, Inc., 322 F.3d 283, 288 (3d Cir. 2003).

As noted by a commentator, however,

> [a] sale of the property of the estate free and clear of liens
> does not impair, divest, void, cancel or destroy any liens or
> interests, but merely transfers liens or the interests attached to
> particular property to liquidated proceeds of the sale in the

29

possession and control of the trustee and the estate and
provides for the satisfaction of the liens in order of priority to
the extent the proceeds derived from the sale are sufficient to
satisfy all valid liens and encumbrances.

11 Norton Bankr. L. & Prac. 3d, Fed. R. Bankr. P. 6004, Editors' Comment (2013).

Typically, an order approving a sale pursuant to section 363(f) will

expressly provide, consistent with section 363(e), that all interests against the property

sold shall attach to the proceeds of sale with the same validity, priority and amount as

existed prior to sale, thereby affording adequate protection to those with an interest in

property that is sold.  See In re Berks Behavioral Health, LLC, 2010 WL 4922173, at *4

(Bankr. E.D. Pa. Aug. 17, 2010); In re Eveleth Mines, LLC, 312 B.R. 634, 649 n.20

(Bankr. D. Minn.), remanded on other grds, 318 B.R. 682 (B.A.P. 8th Cir. 2004); In re

P.K.R. Convalescent Centers, Inc., 189 B.R. 90, 94 (Bankr. E.D. Va. 1995); House

Report No. 95-595, 95th Cong., 1st Sess. 345 (1977).

In construing section 363(f), the Third Circuit Court of Appeals has

instructed that the term "interest" includes, but is broader than, liens on the property to be

sold:

Some courts have narrowly interpreted interests in property to
mean in rem interests in property, such as liens. . . .  However,
the trend seems to be toward a more expansive reading of
"interests in property" which "encompasses other obligations
that may flow from ownership of the property."  3 Collier on
Bankruptcy ¶ 363.06[1].

In re Trans World Airlines, Inc., 322 F.3d at 288-89 (citations and footnote omitted)

(airline workers' employment discrimination claims, as well as flight attendants' rights

under travel voucher program, constituted an interest in the airline assets sold under

section 363(f)); see also Folger Adam Security, Inc. v. DeMatteis/ MacGregor JV, 209

F.3d 252, 264-65 (3d Cir. 2000) (setoff rights constitute an interest in property and can be divested by a sale under section 363(f)).

       In this contested matter, holders of liens on the debtor's realty, Ciena, the City of Philadelphia and South Street Head House District, have all consented to the trustee's sale motion. Their consent meets the requirement of section 363(f)(2). Purported lienholder Creek Road Funding, LLC has not consented and it opposes the sale. The trustee maintains, however, that Creek Road's lien claim is subject to a bona fide dispute under section 363(f)(4), and I agree.

       The phrase "bona fide dispute" used in section 363(f)(4) is not defined in the Bankruptcy Code. The identical phrase is used in section 303(h)(1) involving contested involuntary bankruptcy petitions. In the context of section 303(h)(1), the Third Circuit Court of Appeals explained that a bona fide dispute exists "'[i]f there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts. . . .'" B.D.W. Associates, Inc. v. Busy Beaver Bldg. Centers, Inc., 865 F.2d 65, 66-67 (3d Cir. 1989) (quoting In re Lough, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986)); see, e.g., In re Elverson, 492 B.R. 831, 835 (Bankr. E.D. Pa. 2013). Not surprisingly, a similar definition is applied to section 363(f)(4). See, e.g., In re Patriot Place, Ltd, 486 B.R. 773, 815 (Bankr. W.D. Tex. 2013) (a bona fide dispute exists "when there is an objective basis for a factual or legal dispute as to the validity of the asserted interest"); In re Taylor, 2011 WL 3206994, at *4 (Bankr. D.S.C. July 27, 2011).

       The congressional intent in enacting section 363(f)(4) is to ensure that the prompt liquidation of estate property is not delayed while the dispute is resolved. See,

e.g., In re Taylor, 2011 WL 3206994, at *4; In re Bella Vista Associates, LLC, 2007 WL

4555891, at *4.  Thus, for purposes of the instant contested matter, I need only decide

whether the trustee has met his burden to demonstrate that a bona fide dispute exists, and

not whether the asserted interest of Creek Road in the debtor's property is actually

invalid.

As noted earlier, Creek Road Funding LLC is an entity created by Mr.

DeFeo in August 2012 that paid certain liens held by the City of Philadelphia on the

Foremost Building.  Creek Road has just filed an adversary proceeding seeking a

declaratory judgment that its claim of approximately $217,000 be subrogated to the tax

lien position of the City that has been repaid.  See Adv. No. 13-0461.

As also noted earlier, while the debtor signed promissory notes in favor of

Creek Road, those notes do not include any security interests.  In addition, since Creek

Road does not assert that it was a co-obligor with the debtor to the City on its property tax

liabilities, the subrogation provisions of 11 U.S.C. § 509(a) do not apply.[16]  See In re

Slamans, 69 F.3d 468, 473 (10th Cir. 1995); In re Tygrett, 72 B.R. 129, 130-31 (Bankr.

C.D. Ill. 1987).  Moreover, to the extent that Creek Road contends that section 509(a) is

not exclusive and that it holds equitable subrogation rights under Pennsylvania law that

this court must recognize, its lack of liability to the City, its recent creation, and its

---

[16]Section 509 states:

(a) Except as provided in subsection (b) or (c) of this section, an
entity that is liable with the debtor on, or that has secured, a claim
of a creditor against the debtor, and that pays such claim, is
subrogated to the rights of such creditor to the extent of such
payment.

demand for promissory notes from the debtor, may (as Ciena argues in its post-hearing memorandum) render that contention problematic.  See In re Estate of Devoe, 2013 WL 4026987, at *3 (Pa. Super. Aug. 8, 2013); Home Owners' Loan Corp. v. Crouse 151 Pa. Super. 259, 262 (1943); see generally In re Photo Mechanical Services, Inc., 179 B.R. 604, 619 (Bankr. D. Minn. 1995).

Accordingly, as to objector Creek Road, I find that the trustee may sell the debtor's assets free and clear of any purported interest held by that entity in the debtor's property because the objector's alleged security interest is in bona fide dispute.  See In re Taylor, 2011 WL 3206994, at *4.  However, the trustee must preserve the amount at issue, $217,000, pending resolution of Creek Road's adversary proceeding.  See In re Balco Equities Ltd., Inc., 323 B.R. 85, 92 (Bankr. S.D.N.Y. 2005).


III.


The remaining objections to the sale were lodged by the debtor and Mr. DeFeo.  Except for Mr. DeFeo's challenge to the trustee's request to divest his leasehold interests (and those of his affiliate company IAS), which will be discussed later, their objections focus primarily upon the proposed sale price of $4 million.  The objectors argue, quite simply, that this sale price is too low.  The objectors agree that the trustee should sell the building promptly, but not to Mr. Harvey for $4 million.

In support of their contention, they rely upon the RMS appraisal for $6.3 million, the January 2013 purchase offer by Mr. Untermeyer for $4.3 million, and the failure of the trustee to increase the debtor's monthly rental income.  The rents received

by the trustee are roughly consistent with the rents received by the debtor pre-conversion, approximately $39,600 per month.  See docket entry #490.[17]  Nonetheless, Mr. DeFeo and the debtor argue that the trustee would have improved the income stream, and thereby rendered the realty more valuable, if he had been willing to expend funds to clean the building properly, improve the various leasehold spaces, and more aggressively seek and sign new tenants.  Finally, the debtor also complains that this sale primarily benefits only secured creditor Ciena, the chapter 7 trustee and the trustee's professionals, and so should not be approved.

### A.

I find unpersuasive the objectors' assertion that the RMS appraisal for $6.3 million represents the true value of the Foremost Building and thus demonstrates that a sale price of $4 million is unreasonable.

First, appraisals by qualified experts represent a prediction about the amount that an arms-length, commercially reasonable sales transaction would yield in the future.  See Matter of Excello Press, Inc., 890 F.2d 896, 905 (7th Cir. 1989).  Thus, they are generally probative of value.  However, an appraisal is not as persuasive as "[a] commercially reasonable sale of an asset [which conclusively] establishes the market value of that asset."  In re BTS Inc., 166 F.3d 346 (table), 1998 WL 788829, at *1 (10th Cir. Nov. 12, 1998).  Appraisals should be relied upon, "only when the price of such a

---

[17]In his July 2013 monthly operating statement, the trustee reported receiving approximately $317,000 during the roughly 8 months that he has been collecting rents.  That averages to about $39,600.

sale cannot be got at directly." Matter of Excello Press, Inc., 890 F.2d at 905; see also

Calvin v. Washington Properties, Inc., 121 F.2d 19, 27 (D.C. Cir. 1941) (challenge to the

adequacy of sale price based upon appraisals was overruled because the sale itself was

conducted fairly); Bryn Mawr Trust Co. v. Healy, 667 A.2d 719, 723 (Pa. Super. Ct.

1995) (adopting sale price over sale offers and an appraisal as more indicative of fair

market value), appeal denied sub nom. Beneficial Sav. Bank v. Healy, 545 Pa. 667

(1996).  Indeed, "[g]enerally speaking, an auction may be sufficient to establish that one

has paid 'value' for the assets of a bankrupt."  In re Abbotts Dairies of Pennsylvania, Inc.,

788 F.2d 143, 149 (3d Cir. 1986).

        While the Harvey offer of $4 million is much lower than RMS, Mr. DeFeo

and the debtor anticipated (and that the trustee hoped for[18]), other than argue that the

trustee should have increased the debtor's monthly rental income before seeking a sale,

which issue will be discussed below, neither objector challenged the reasonableness of

the trustee's marketing efforts.[19] The trustee advertised in the real estate community,

resulting in many inquiries; a number of prospective purchasers inspected the property;

and four to five hired their own experts to evaluate the property's worth and to decide

whether to make an offer.  Despite these efforts only two offers were received: one for $4

million and one for $4.377 million.  Moreover, the trustee then unsuccessfully tried to

obtain competing bids and hold an auction, even up to the time of the hearing on the sale.

---

[18]Since the compensation of Mr. Astrella and the trustee are related to the sale
price, they both had a strong incentive to try to obtain the highest price possible.

[19]Indeed, the debtor offered Mr. Jones of RMS as an expert "in the brokerage of
properties," as well as a qualified appraiser.  However, Mr. Jones never opined that the trustee's
advertising or sale procedures were inadequate.

The objectors overlook that all marketing efforts must reveal to prospective purchasers that the property is being sold through a bankruptcy process.  Section 704(a)(1) places upon trustees the duty of expeditious disposition of property.  Consistent with this duty, section 721 limits the time within which a trustee can operate the debtor's business.  Furthermore, in this particular chapter 7 case the income derived from the business operation constituted the cash collateral of a creditor, Ciena, who—after being promised by the debtor to be repaid by a sale or refinancing by April 2012—was anxious for a prompt trustee sale.  Where a bankruptcy trustee is under some constraints to sell estate property, the value obtained is likely to reflect those constraints.  As the Supreme Court has observed in the context of an execution sale:

> [M]arket value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very antithesis of forced-sale value.  "The market value of . . . a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property."

BFP v. Resolution Trust Corp., 511 U.S. 531, 537-38 (1994) (quoting Black's Law Dictionary 971 (6th ed. 1990)).  A bankruptcy trustee is compelled to sell and prospective purchasers know it.

Thus, the fact that trustee proposes to sell the debtor's property for less than the RMS appraised value does not demonstrate that the sale price is unreasonable, so long as the trustee undertakes reasonable marketing efforts.  See generally United States v.

36

<u>Buchman</u>, 646 F.3d 409, 411 (7th Cir. 2011).  Rather, the result places in question the accuracy of the appraisal.

B.

Second, the reasonableness of the Harvey offer, and the unpersuasiveness of the RMS opinion as to the actual value of the debtor's realty in both 2012 and August 2013, is further supported by the following facts:

(a) The debtor, despite being a chapter 11 debtor in possession for more than two years, in 2012 was unable to sell its property for $6.1 million or obtain refinancing for its property of $3,780,000.  If the property was indeed worth $6.3 million, the financing sought by the debtor in 2012 constituted just 60% of the realty's value.  The debtor's inability to sell or refinance in 2012 suggests that the RMS opinion of value in 2012, repeated in August 2013, is too high.

(b) The January 2013 offer by Mr. Untermeyer of $4.377 million, on terms set out earlier, assumes that the property would be appraised in that amount, but provides for the possibility that a lender's appraisal would be lower.

(c) Certain components of the RMS income capitalization approach were not supported by the evidence.  For example, almost $400,000 of value in its appraisal is derived from an anticipated cell phone tower lease.  However, the trustee testified that,

37

despite his efforts, he was unable to obtain any lease offer, and no contrary evidence, such as a written offer, was presented.[20]

In addition, I find that the Lukens & Wolf classification of the Foremost Building as a Class C building more persuasive than the Class B classification found in the RMS report.  RMS had not inspected the building in more than one year, and there was credible testimony regarding deferred maintenance and Housing Code violations. Moreover, the debtor's actual monthly rental income is considerably lower than RMS was led to believe by Mr. DeFeo.  The lower income stream supports Lukens & Wolf's opinion of the type and financial conditions of tenants the debtor has attracted and is likely to attract in the future.  As RMS acknowledged, a lower building classification

---

[20]Exhibit T-14, the undated rent roll prepared by Mr. DeFeo, includes the following within a note placed at the bottom:

> Roof rental from $100,000 to $200,000 per year or cash now at
> $400,00 to $800,000. . . .

This is likely to be the source for RMS's inclusion of value for the cell phone tower lease within its appraisal, because RMS writes:

> We note that the property owner is currently in negotiations to lease
> the roof-top to a company that operates cell phone towers.
> Discussions with the property owner suggest that two options are
> available with regard to compensation to the building owner, one
> being an annual payment for the life of the lease.  The second
> option is for a lump-sum payment for the term of the lease.  An
> agreement that was provided to the appraiser by the property owner
> provides for an up-front payment of $390,000.  Therefore, in lieu
> of including the cash-flow from the cell towers, we have adjusted
> the indicated value of the building by the factored value of the
> cash-flow stream, which is $390,000.

Ex. D-16, at V-5.  If Mr. DeFeo had an actual offer to lease the roof of the Foremost Building for use as a cell phone tower, he declined to present it at the hearing.  Thus, I find credible the trustee's testimony that he was unable to obtain any offer despite attempts to do so.

38

increases the risk of the investment and raises the income capitalization rate to at least

9.5%.  Ex. D-16, at V-4.

Without challenging any other assumptions made by RMS, if one simply

deducts from its estimate of value the portion attributed to the non-existent cell phone

lease and changes the income capitalization rate to 9.5%, the RMS valuation is reduced to

roughly $5 million.

(d) In addition to those two significant reductions, the evidence regarding

the condition of the realty and its actual monthly income stream would, as Lukens & Wolf

opined, cause a prospective purchaser to reduce its offer to account for expenses

associated with obtaining an anticipated stabilized income stream, including tenant

improvements and leasing commissions.  Ex. T-7(2) (Addendum).  Those expenses were

estimated to be roughly $180,000.[21]  Id.  RMS, believing that the Foremost Building was

in good condition with a stabilized rental stream, did not include these expenses in its

appraisal report.  Again, without adjusting RMS's other assumptions, this third

modification to its income capitalization method would yield a valuation of slightly more

than $4.8 million.

(e) I recognize that this modified valuation is still $1 million higher than the

Lukens & Wolf appraisal.  Both appraisers were recognized at the hearing as experienced

and competent.  At the hearing, counsel for Creek Road noted that when two competent

appraisers disagree, the actual value of property is often the midpoint between two

appraisals.  Given that appraisal valuations themselves typically are the midpoint of a

---

[21]I have not considered other anticipated reductions such as "entrepreneutial
incentive" included by Lukens & Wolf.  Ex. T-7(2) (Appendix).

range, courts have accepted this approach in appropriate instances.  See, e.g.,

Albuquerque Chemical Co., Inc. v. Arneson Products, Inc., 201 F.3d 447 (table), 1999

WL 1079600, at *2 (10th Cir. Nov. 30,  1999) (no error for bankruptcy court to use the

average of the two appraisals); Martin v. Martin Bros. Container & Timber Products

Corp., 241 F.Supp. 2d 815, 817 (N.D. Ohio 2003) ("I conclude that the only sensible

resolution of this dispute is to accept the defendants' suggestion that I accept the midpoint

between the two fair market value appraisals."), aff'd, 112 Fed. Appx. 395 (6th Cir.

2004); In re Atwood, 2001 WL 34050701, at *4 (Bankr. D. Vt. Jul. 24, 2001) ("an

averaging of the two appraisals is the most reliable indicator of value"); Newton v.

Newton, 25 Phila. Co. Rptr. 478, 482 (C.P. Apr. 6, 1993).  Indeed, agreements often

provide that, in the event of a dispute, the fair value of property, or of an interest in

property, would be determined by the averaging of appraisals.  See, e.g., Rohm & Haas

Co. v. American Finance Group, Inc., 1988 WL 115786, at *1 (E.D. Pa. Oct. 31, 1988);

Polo v. Shwiff, 2013 WL 1797671, at *1 (N.D. Cal. Apr. 29, 2013).

      The midpoint between the RMS appraisal, as adjusted above to $4.8

million, and the Lukens & Wolf appraisal of $3.8 million is $4.3 million, which is

consistent with the Untermeyer anticipated appraisal value implicit in his January 2013

offer.

      (f) RMS assumed that the debtor's gross monthly rental income was about

$58,000.  This is consistent with the information in two rent rolls prepared by Mr. DeFeo,

exs. T-14 and T-15, at least one of which was likely provided to RMS for its appraisal.

That figure is about $20,000 higher than the average rent the debtor was able to achieve

in its more than two years as a debtor in possession.  As will be discussed below, had

RMS used more accurate historical income information, and had used a 9.5%

capitalization rate, its valuation using an income capitalization approach would be about

$4 million.

   (g) Finally, in support of its income capitalization approach, RMS also

applied the comparable sales method of valuation.  The comparable sales used by RMS,

however, were unpersuasive as they were located in downtown Philadelphia, but west of

Broad Street; in West Philadelphia near Drexel University and the University of

Pennsylvania; in South Philadelphia; and in the far Northeast Philadelphia.  None of these

comparables were near to or in locations similar to the debtor's Foremost Building; the

locations were superior, and so these properties sold for prices ranging from $122/sq. ft.

to $275/sq. ft.  Ex. D-16, at VI-1.  RMS concluded that these comparable sales warranted

a valuation for the Foremost Building of $6.4 million, based upon $164/sq. ft. applied to

the 39,260 square feet it concluded the Foremost Building contains.  Id., at VI-11.

   As mentioned above, Mr. Jones of RMS agreed at the hearing that

comparable sale #1 used by Lukens & Wolf was appropriate to consider in applying the

comparable sales approach.  Its location is just a few blocks from the Foremost Building

and is in a similar neighborhood; also similar are its size and the type of tenants in the

building.  Comparable #1 reported an occupancy rate of 80%-85% and, like the Foremost

Building, it had deferred maintenance.

   That property, consisting of approximately 47,000 square feet, sold for

$3,430,000 in December 2010, at approximately $73/sq. ft.  Ex. T-7(2), at 29, 36-37.

Lukens & Wolf believes that the Foremost Building has approximately 51,000 square

feet.  At $73/sq ft, the Foremost Building would be valued at $3,723,000.  Even if the

commercial real estate market in that section of downtown Philadelphia has improved

since December 2010 by 10%, at $80/sq. ft. the debtor's realty would have a value of

roughly $4.1 million, which is consistent with the appraisal midpoint approach of $4.3

million.

       For these reasons, even if I were to ignore the results of the trustee's

marketing efforts and considered only the two appraisal reports and the evidence

surrounding them, I would conclude that the value of the Foremost Building, in its present

condition, is much closer to the Lukens & Wolf estimate than the RMS estimate.  Even

using the midpoint mentioned above of $4.3 million and the Untermeyer conditional offer

in January 2013, I find that the Harvey bid of $4 million is reasonable, as within 90% of

this valuation:

> Traditionally, courts have held that "[f]air and valuable
> consideration is given in a bankruptcy sale when the
> purchaser pays 75% of the appraised value of the assets."

In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149 (quoting In re Rock

Industries Machinery Corp., 572 F.2d 1195, 1197 n.1 (7th Cir. 1978)); see, e.g., In re

Colony Hill Associates, 111 F.3d 269, 276 (2d Cir. 1997); Ready v. Rice, 2006 WL

4550188, at *3 (D. Md. Sept. 26, 2006).


C.


       I find the objectors' other complaints about the reasonableness of the

trustee's conduct in accepting the Harvey offer equally unpersuasive.

42

The debtor and Mr. DeFeo maintain that the trustee should have accepted Mr. Untermeyer's $4.377 million offer as higher than Mr. Harvey's $4 million proposal. I appreciate that a chapter 7 trustee has a duty to use reasonable efforts to maximize the sale of estate property.  See Corporate Assets, Inc. v. Paloian, 368 F.3d 761, 767 (7th Cir. 2004); In re Martin, 91 F.3d 389, 394 (3d Cir. 1996).  Thus, faced with two bona fide offers on substantially similar terms, the trustee should accept the higher proposal. However, "[t]he highest bid does not always equate to the best bid for the estate." In re Diplomat Const., Inc., 481 B.R. 215, 219 (Bankr. N.D. Ga. 2012).  As observed recently by one court:

> [E]ven in the case of an auction, "[t]he highest bid does not always equate to the best bid for the estate." In re Diplomat Const., Inc., 481 B.R. 215, 219 (Bankr. N.D. Ga.2012). Central to the inquiry is whether the "Trustee carefully weighed the competing bids rather than mechanistically recommending the facially higher bid." In re Bakalis, 220 B.R. [525] at 532 [Bankr. E.D.N.Y. 1998].

In re Volpe Industries, Inc., 2013 WL 4517983, at *5 (D. Mass. Aug. 23, 2013); see generally U.S. v. Chemical Foundation, 5 F.2d 191, 206 (3d Cir. 1925) (" It is common knowledge of all lawyers and many business men that the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two."), aff'd as modified, 272 U.S. 1 (1926).

Given the financing contingency and other provisions of the Untermeyer proposal in January 2013, it was within the trustee's sound business judgment to accept a somewhat lower all-cash offer with no contingency.  See In re JL Building, LLC, 452 B.R. 854, 860 (Bankr. D. Utah 2011).

43

Indeed, the debtor had been unsuccessful in its attempt to borrow $3,780,000 in mid-2012. Mr. Untermeyer's proposed $4.3 million purchase price was conditioned upon his borrowing $3.5 million on a non-recourse basis, and at an interest rate of 4.8%—loan conditions for which he had not been pre-approved. The trustee could reasonably believe that no such financing would be obtained, and thus only a sale to Mr. Harvey would result in the prompt liquidation of the realty. See generally In re Buerge, 479 B.R. 101, 107 (Bankr. D. Kan. 2012) ("The trustee's duty is to maximize the value obtained from a sale, but he must also avoid undue risk."). Moreover, the Untermeyer offer was conditioned upon a prospective lender not obtaining a lower appraisal. The Lukens & Wolf appraisal obtained by the trustee was indeed lower.

## D.

The debtor and Mr. DeFeo complain most loudly that the trustee failed to aggressively increase the building's rental income which, they believe, would have increased its value to prospective purchasers. Indeed, they equate this failure with inadequate marketing. The debtor argues:

> [T]he Trustee did not adequately market the Property to prospective lessees in order to increase its occupancy rate and make it more attractive to potential buyers, or to properly take into account the diminished curb appeal of having three of five vacant retail spaces on the ground floor of the building. The Trustee allowed $4,500.00 of monthly rent to be lost in the form of vacating retail tenants, and failed to lease new retail space at a possible monthly rate of $4,000.00. Such failure was likely due to the Trustee's determination that the Property would need to be gutted and converted to a new use, and that the Property should be marketed as nothing more than a shell. Unfortunately, such determination was

44

> erroneous and the actions taken in furtherance thereof greatly
> diminished the potential sales price of the Property such it
> was as if the Property was not truly marketed at all.

Debtor's Post-Hearing Memorandum, at 9-10 (unpaginated) (footnotes omitted).

As noted above, in general, when property is inadequately marketed the

trustee will be unable to meet his burden to demonstrate that the proposed sale price is

reasonable.  See In re Buerge, 479 B.R. at 108:

> The Trustee testified he has not publicized the sale at all
> except for pleadings he filed and served on creditors.  The
> Trustee testified Prime's offer is the best available price
> because it is the only offer, not because it is the result of
> extensive marketing or competitive bidding.  The lack of
> effort to solicit other bids severely undermines the Trustee's
> conclusion regarding a fair sale price.  The evidence shows
> Prime's bid is based on paying off the liens and leaving just
> enough to provide a pittance to distribute to unsecured
> creditors.  No evidence shows the bid is based on the value of
> the stock.

(footnote omitted).

Here, there is no question that the trustee, through his broker, marketed the

property widely and in accordance with accepted practices.  In response to the objectors'

complaints regarding his failure to maximize the property's potential rental stream the

trustee counters with this explanation:

> The trustee has used his best efforts to operate the debtor's
> building as a going concern.  It has not been easy.  Such
> operation could only be accomplished with the complete
> cooperation of Ciena for it also has a lien over the rents
> derived from the tenants located in the building.  While the
> cash flow has largely been sufficient to cover the day-to-day
> operational costs of the building, a seemingly never ending
> series of unexpected costs derived from deferred maintenance
> over a long period of time continue to challenge the ability of
> the Trustee to invest in tenant improvements or to spruce up
> vacant space to attract new tenants.

Trustee's Post-Hearing Memorandum, at 10 (unpaginated).

After consideration of the evidence, I find that the trustee's priority
choices—to address Housing Code violations, to begin dealing with deferred
maintenance, and to evict tenants who were not paying rent—rather than to concentrate
on spending funds for tenant improvements and increased rental income, to be within his
business judgment, as was his reliance upon the opinion of an experienced appraiser,
Lukens & Wolf.  Indeed, the debtor's objection overlooks that the Lukens & Wolf
appraisal was dated in December 2012, about one month after the trustee was appointed,
and his marketing efforts began about one month later, leaving him little time to focus on
significantly increasing rental income.

Furthermore, the trustee's priorities also improved the value of the building
to knowledgeable prospective purchasers who were hiring their own inspectors and
appraisers, and thus not likely to be greatly influenced by minor cosmetic improvements.
In addition, the trustee has preserved more than $100,000 which will be distributed to
creditors.

Moreover, had the trustee concentrated his funds and efforts on improving
the Foremost Building's monthly rental income, as the objectors insist he should have, the
income capitalization approach based upon the Foremost Building's actual rental income
would not have predicted that a potential purchaser would value the realty for much more
than $4 million.

Recall that the RMS appraisal, which I concluded should be adjusted to no
more than $4.8 million, already assumed that the debtor generated, on average, roughly
$58,000 in monthly rentals: almost $20,000 per month more than it actually receives.  If

46

RMS had known the historical, actual monthly rental income recently generated by the debtor and trustee, even increasing that income by a speculative $8,500 per month, as the debtor argues, would result in an RMS valuation of no more than $4 million.[22]  In other words, the RMS appraisal, as adjusted, already assumed a monthly gross rental stream far greater than even the debtor argues that the trustee should have achieved.

Lukens & Wolf's income capitalization approach yielded a valuation of less than $3 million, based upon actual income and expense data provided by the trustee. Increasing rental income by $102,000 annually would increase its income capitalization value by about $1 million, to $3.8 million.  This valuation is consistent with its comparable sales approach.

Furthermore, to the extent the debtor implies to the contrary, the trustee has maintained a monthly income stream similar to that accomplished by Mr. DeFeo; he did not let the property languish once he took over.

Thus, this particular complaint about the trustee's failure to increase rental income above the level that the chapter 11 debtor in possession had obtained does not undermine the reasonableness of the trustee's marketing efforts and, thus, the reasonableness of the trustee's sale proposal.

---

[22]Adding $8,500 per month in gross rental income to the almost $39,000 per month the trustee has actually obtained, yields roughly $47,000/month or $564,000 per year. RMS concluded that yearly expenses were approximately $250,000.  Thus net annual income would be $314,000.  RMS further opined that the capitalization rate for Class B buildings is 7.75%  Absent some adjustment to anticipated expenses, and without considering any anticipated expenses to bring about stabilized rent and a speculative cell phone tower lease, the income capitalization approach is $4.05 million.  If the Foremost Building is a Class C building, the RMS capitalization rate is 9.50% yielding a value of $3.3 million.

E.

Finally, the debtor also contends that the trustee's motion should be rejected because the sale primarily benefits secured creditor Ciena, the trustee and the trustee's professionals, and is of little or no benefit to unsecured creditors.  This contention is also unpersuasive on the facts presented.

It is generally recognized that a bankruptcy trustee should not liquidate fully encumbered assets, for such action yields no benefit to unsecured creditors.  See, e.g., In re K.C. Machine & Tool Co., 816 F.2d 238, 245-46 (6th Cir. 1986); 6 Collier on Bankruptcy, ¶ 725.01 at 725-2 (16th ed. 2012) ("It is not the proper function of the trustee to liquidate property solely for the benefit of secured creditors").  With fully encumbered property, the proceeds must be paid to the secured creditors.  See 11 U.S.C. § 725; see generally 6 Collier on Bankruptcy, ¶ 725.01 at 725-2 (16th ed. 2012) ("Section 725 permits collateral or its proceeds to be returned to the proper secured creditor. . . .").  Thus, it is appropriate for a chapter 7 bankruptcy trustee to abandon any interest in fully encumbered estate property and allow the secured creditors to exercise their right to recover possession of their collateral.  See, e.g., In re K.C. Machine & Tool Co., 816 F.2d at 246; Matter of Ratcliff Enterprises, Inc., 44 B.R. 778, 781 (Bankr. E.D. Mich. 1984) (trustee authorized to abandon a liquor license which is fully encumbered); see also In re Blue Coal Corp., 1994 WL 325431, at *2 (Bankr. M.D. Pa. June 16, 1993).  A similar conclusion may be appropriate when the sale price is sufficient only to pay secured creditors and the trustee's fee.  See, e.g., In re Feinstein Family Partnership, 247 B.R. 502, 507 (Bankr. M.D. Fla. 2000) (" Clearly, the Code never contemplated that a Chapter

7 trustee should act as a liquidating agent for secured creditors who should liquidate their own collateral."); see generally In re Lan Associates XI, L.P., 192 F.3d 109, 120 (3d Cir. 1999).

In this contested matter, Mr. Seitz has recognized this concern and has negotiated with Ciena to insure that unsecured creditors will receive some meaningful benefit from this sale. The claims bar date has long expired. Aside from Mr. DeFeo's remaining claim of $77,000, which is likely to be contested by the trustee, and the City of Philadelphia claims that the trustee expressly does challenge as having been settled and paid, the claims register shows approximately $90,000 in non-administrative, unsecured claims.[23]

The trustee has obtained the consent of Ciena to reduce by roughly $470,000, the portion of sale proceeds that the trustee believes would be payable to Ciena under section 725. The trustee estimates that this will yield a distribution to non-administrative creditors of $30,000 to $40,000, or approximately 18%. See Trustee's Post-Hearing Memorandum, at 7 (unpaginated).

Given the various challenges to claims that have not yet been resolved, I cannot now determine the percentage distribution that will be made to non-administrative unsecured creditors. Moreover, the Ciena carve-out is part of an agreement that will be addressed below. I do conclude, however, that with this reduction there is sufficient benefit to non-secured creditors to find that the trustee is acting in good faith in proposing

---

[23]The debtor's suggestion that Creek Road Funding may also hold an unsecured claim overlooks the March 14, 2013 proof of claims bar date. Creek Road Funding did not file a proof of claim in this case until August 2013. It may be difficult for this entity to complain about lack of notice of the bar date when Mr. DeFeo, its sole member clearly knew of the deadline—he filed his own proofs of claim on March 14th.

to sell this realty for $4 million.  See In re Pearl Mar Partnership, 29 F.3d 633 (table),

1994 WL 386381, at *2 (9th Cir. July 25, 1994):

> The Madans argued below that because the Long Beach
> property was in excellent condition and at a prime location, its
> actual value was $600,000, and that the trustee acted in
> collusion with the Cowans to defraud the bankruptcy estate by
> selling the property for a price well below its value.  The
> bankruptcy court, however, concluded that the $326,000 was
> "an attractive price" and that the sale was in the best interest
> of the estate and its creditors.  Moreover, the bankruptcy court
> recognized that the bankruptcy estate also would benefit from
> an agreement with the second trust-deed holder of the
> property which provided that $20,000 of the sale price would
> be remitted to the estate for distribution to unsecured
> creditors.  Thus, the bankruptcy court's findings that the estate
> would benefit from the sale of the Long Beach property to the
> Cowans and that the Cowans were good-faith purchasers were
> not clearly erroneous.

For all of the reasons stated above, I find that the trustee's acceptance of the

offer of $4 million in cash, with no present contingencies, to be within his reasoned

business judgment, and for the bidder, Philip Harvey, to have proposed to purchase the

debtor's property in good faith.


IV.


As a component of his sale motion, the chapter 7 trustee seeks approval

under Federal Rule of Bankruptcy Procedure 9019(a) of his agreement with Ciena.  Ex.

T-8.  This agreement, in which the trustee states that Ciena holds an allowed secured

claim of approximately $3.23 million, establishes that Ciena has a valid lien on the

debtor's receivables and rent payments, and most importantly, contains three provisions

relevant to the instant sale motion: (1) that Ciena agrees to "subordinate and carve-out"

from its collateral certain funds that the trustee can use to pay administrative expenses

and unsecured claims; (2) that the trustee releases Ciena from any litigation to surcharge

its collateral under 11 U.S.C. § 506(c); and (3) that the trustee is authorized to make

interim distributions to Ciena, as he deems warranted, to pay down its allowed secured

claim.  Ex. T-8.

      Although no precise figure is stated in this proposed agreement, at the

hearing the trustee clarified that the carve-out amount, to which Ciena consents, will

reduce that creditor's distribution by almost $470,000.  The trustee proposes to pay Ciena

approximately $3.24 million from sale proceeds, and the trustee agrees not to seek further

awards from Ciena's collateral.  The trustee views this as a settlement of his potential

claim to surcharge collateral under 11 U.S.C. § 506(c).

      Recently, the Third Circuit Court of Appeals analyzed the provisions of

section 506(c):

> Margolis seeks to collect fees and expenses out of the
> proceeds of the sale of the Collateral.  In general, such fees
> and expenses are not chargeable against secured collateral.
> [In re] Visual Indus., 57 F.3d [321] at 324 [3d Cir. 1995].
> Instead, they ordinarily may be charged only against the
> surplus of the debtor's estate.  Id.  However, section 506(c) of
> the Bankruptcy Code provides a limited exception to this rule,
> which allows a claimant to "recover from property securing
> an allowed secured claim the reasonable, necessary costs and
> expenses of preserving, or disposing of, such property to the
> extent of any benefit to the holder of such claim. . . ." 11
> U.S.C. § 506(c).
>
> Section 506(c) is designed to allow a claimant who has
> expended funds to preserve or dispose of secured collateral to
> recover those funds from the secured creditor who directly
> benefitted from them, thus "prevent[ing] a windfall to the
> secured creditor at the expense of the claimant."  Visual
> Indus., 57 F.3d at 325 (citing IRS v. Boatmen's First Nat'l
> Bank of Kan. City, 5 F.3d 1157, 1159 (8th Cir. 1993)).  As we

have explained, however, section 506(c) permits a claimant to
recover expenses from the secured collateral only under
"sharply limited" circumstances. Id. "[T]o recover expenses
under § 506(c), a claimant must demonstrate that (1) the
expenditures are reasonable and necessary to the preservation
or disposal of the property and (2) the expenditures provide a
direct benefit to the secured creditors." In re C.S. Assocs., 29
F.3d 903, 906 (3d Cir. 1994).

In re Towne, Inc., 2013 WL 4566061, at *2 (3d Cir. Aug. 29, 2013) (non-precedential).

Here, the trustee asserts that he has expended time and funds to preserve the

Foremost Building for sale, obtained court approval to operate the debtor's business,

engaged and oversaw a property manager/real estate broker, marketed the real property,

found a purchaser and negotiated a fair price, and litigated against opposition to the sale,

all with the express consent of Ciena, and all of which provided a direct benefit to Ciena.

Moreover, the trustee contends that approval of this agreed carve-out is warranted as it

falls within the range of reasonableness, will benefit all administrative expense claimants

as well as general creditors, and will expedite the administration of this bankruptcy case.

See generally In re Martin, 91 F.3d 389, 394 (3d Cir. 1996).

Upon review of the parties' post-hearing submissions as well as their

arguments at trial, no party suggests that the trustee's compromise of his section 506(c)

claim is unfair to the bankruptcy estate. Moreover, my review of the trustee's estimate of

his administrative expenses persuades me that if he litigated a claim under section 506(c),

he would be unlikely to achieve a better result under the standard enunciated by the Third

Circuit.

Accordingly, that portion of the proposed agreement by which the trustee is

relinquishing his potential section 506(c) claim will be approved. See generally In re

52

Godon, Inc., 275 B.R. 555, 569-70 (Bankr. E.D. Cal. 2002); In re Topgallant Lines, Inc.,
1996 WL 33402828, at *1-*2 (Bankr. S.D. Ga. Dec. 23, 1996).

      The provision of the settlement authorizing the trustee to make some
interim distribution to Ciena is also reasonable, as the trustee has no need to retain all of
the sale proceeds to administer this bankruptcy estate.  Given, however, that various
disputed interests will attach to the proceeds of sale, less clear is the reasonableness of the
trustee's intention to distribute immediately more than $3 million to Ciena.

      Accordingly, the trustee's agreement with Ciena will be approved, subject
to the trustee's being authorized to limit his interim payment to Ciena in an amount not to
exceed $2.8 million.  There is no evidence that Ciena's allowed claim will be less than
that amount; and the retention by the trustee of sale proceeds, after payment of the normal
costs of sale, including commissions and taxes, plus certain small and undisputed lien
claims, will be sufficient to conclude the administration of this bankruptcy estate.

## V.

      As previously mentioned, the purchase offer made by Mr. Harvey is
conditioned upon the following: the trustee shall "terminate all leases and occupancy by
the prior owner, Peter Defoe [sic] prior to settlement."  Ex. T-5, at 9.  Thus, the trustee
now seeks to sell the Foremost Building free and clear of all leasehold interests held by

Mr. DeFeo and IAS, the latter being the only DeFeo affiliate to assert a leasehold interest.[24]

As discussed earlier, Mr. DeFeo and IAS alleged leasehold interests in six units of the Foremost Building.  For the following reasons, after reviewing the evidence of record, I find that there is a bona fide dispute regarding the current validity of those asserted leasehold interests within the meaning of section 363(f)(4).  See generally In re Bedford Square Associates, L.P., 247 B.R. 140, 145 (Bankr. E.D. Pa. 2000).

As mentioned earlier, Mr. DeFeo contends that both he and IAS prepaid their rent on the alleged leasehold interest so that they are current in their obligation.  Mr. DeFeo refers to three payments made to Scimeca in September 2008 totaling almost $220,000, ex. D-14(a), at 2, and a $105,000 payment made in October 2009 into a Scimeca bank account at Citibank, ex. D-14(b), as constituting prepaid rent.  Neither of these exhibits supports the position that the payments were intended at the time as prepaid rent nor treated as such.  Not only do these payments predate some of the leases in question, but ex. D-14(a) reflects that only $450 of one of the payments, the payment made on September 29th by an entity called "Sleeping with the Fishes" ("SWTF"), another DeFeo company, was classified as rent owed to the debtor by SWTF, with the balance charged for "site usage."  Ex. D-14(a). Furthermore, the September 12th payment

---

[24]The trustee did not give notice of his sale motion to any other tenants and so does not seek to sell free and clear of those tenancies.  See generally Folger Adam Security, Inc. v. DeMatteis/MacGregor JV, 209 F.3d 252, 265 (3d Cir. 2000); In re Reinert, 467 B.R. 830, 831-32 (Bankr. W.D. Pa. 2012).

of $102,270.38 was identified as a loan made by SWTF, with that amount due from the debtor.  Id.

Exhibit D-14(b) simply reflects that the October 2009 payment made to the debtor was then immediately transferred.  Mr. DeFeo testified that he used those funds to pay a portion of the debtor's loan obligation to Ciena.  No reference is made to prepaid rent in favor of Mr. DeFeo or IAS.  Ex. D-14(b).  Moreover, the ledger sheet does not include this payment as rent received; instead, it is listed next to the name "Rob Man" in the tenant column.  Ex. T-12 (2009 entries, pg 2 of 2[25]).

Similarly, the debtor's tax returns state that the debtor was operating on a cash rather than an accrual basis, see ex. T-11(D) (2011 tax return, Schedule K), but disclose no outstanding liability for prepaid rent as a payable; neither do the debtor's bankruptcy schedules nor monthly operating reports refer to any such liability.

Even if I were to accept as true that IAS paid $10,000 in July 2012 to the debtor for rent due on unit 245/445, its ledger rent obligation was $800 per month beginning February 2011, not $500.  Thus, if the ledger is considered accurate, IAS would still be delinquent as of the date of the sale hearing as to that leasehold unit. Moreover, the debtor's June 2011 rent roll attached to its amended disclosure statement identifies unit 245/445 as not rented.

As noted in the chart above, the debtor's ledger reflects numerous payments credited in favor of IAS in 2011 concerning unit 248/448, totaling more than $92,000.  As for this unit, I note that the lease, ex. T-9, purports to have been signed in June 2008, with a monthly payment to begin in September 2008 of $800 per month.  The ledger, however,

_____

[25]The 2009 entries contain duplicate pages.

reflects that the actual tenant for unit 248/448 was the Reiki School, who is listed as the unit tenant from January 2006—the beginning date of the ledger—through 2010, and who is credited as having paid monthly rent.  No testimony was offered to explain this discrepancy.  Moreover, if IAS were indeed liable as a tenant after 2010, with a monthly rent obligation, according to the ledger, of $550, Mr. DeFeo implicitly contends that IAS elected in 2011—and the debtor agreed—to prepay rent for a period of 14 years, while holding a questionable year-to-year 2008 lease.  Moreover, these payments took place while the debtor was a chapter 11 debtor in possession and without any disclosure of this postpetition leasehold interest or the alleged prepayment.

Equally questionable is the ledger entry referring to the $96,736.05 repayment in September 2008 to Mr. DeFeo of a loan made to Mr. Perdie, with the notation: "Advance Rent DeFeo et al."  Ex. T-12 (year 2008 unnumbered pg 5 of 6).[26]  As this entry is placed at the end of the ledger entries for 2008, it is not clear when this entry was made.  The debtor's cash receipts journal for September 2008, ex. D-14(a), places these funds in a column headed "Sundry," not the neighboring column headed "Rents" where various other deposits are included.

Thus, not only is this 2008 ledger entry contradicted by the debtor's receipts journal for that time-period, Mr. DeFeo is implicitly contending that these 2008 funds represented in 2008 prepayment of rents for himself and any of his affiliated companies, such as IAS, for whatever leaseholds he or they may elect to occupy in the future.

---

[26]There are other entries referring to prepaid rent but none involved IAS or Mr. DeFeo.

56

Finally, as to unit 498/598, to the extent Mr. DeFeo held any leasehold interest based upon a January 2010 lease, he apparently relinquished that interest because Scimeca leased that same leasehold to Mr. Wirs in November 2012.  Mr. Wir then vacated the unit in March 2013, and the trustee, who has acted for the debtor since his appointment on November, 6, 2012, has not entered into any current lease with Mr. DeFeo for that unit.

As with the payment to the City of Philadelphia from funds provided through an affiliated entity known as Creek Road funding, the evidence supports the conclusion reached by Mr. Persing that Mr. DeFeo used funds titled in the name of himself and affiliate entities to pay obligations of Scimeca, because the rental income generated by the debtor was insufficient to do so.  On the evidence presented, such payments to the debtor from affiliates are as likely to be legally treated as gifts, see Towe Iron Works, Inc. v. Towe, 243 S.W.3d 562, 569 (Tenn. Ct. App. 2008), or unsecured loans, as rent prepayments.  Mr. DeFeo's use of the Perdie loan proceeds to pay Ciena is as likely to be viewed as a capital contribution as a rent prepayment.  See In re SubMicron Systems Corp., 291 B.R. 314, 322-23 (D. Del. 2003); O'Reilly v. Cellco Industries, Inc., 265 Pa. Super. 558, 564-65 (1979).

Similarly to the asserted secured claim of Creek Road Funding, LLC, I need not now decide whether IAS (which has never filed a claim in this case nor was listed as a creditor by the debtor) and Mr. DeFeo hold valid leasehold interests.  Rather, I conclude that the present validity of any such interests are properly disputed by the trustee.

I further conclude, in light of the instruction provided by the Third Circuit, in construing the term "interest" in section 363(f) as inclusive of "obligations that may

57

flow from ownership of the property," In re Trans World Airlines, Inc., 322 F.3d at 288-89; see also In re PBBPC, Inc., 484 B.R. 860, 869 (B.A.P. 1st Cir. 2013), that a possessory leasehold interest is included within the scope of section 363(f).  See, e.g., Precision Industries, Inc. v. Qualitech Steel SBQ, LLC, 327 F.3d 537, 545 (7th Cir. 2003); but see In re R.J. Dooley Realty, Inc., 2010 WL 2076959, *8 (Bankr. S.D.N.Y. May 21, 2010) (leasehold interest is not entitled adequate protection if the realty is sold under section 363(f)).

Although not raised by Mr. DeFeo who is acting pro se, courts are divided on the question whether section 365(h) protects lessees from eviction after a sale under section 363(f). Compare, e.g., Precision Industries, Inc. v. Qualitech Steel SBQ, LLC (section 365(h) does not override section 363(f)); In re MMH Automotive Group, Inc., 385 B.R. 347, 365-67 (Bankr. S.D. Fla. 2008) (same) with, e.g., In re Zota Petroleum, LLC, 482 B.R. 154 (Bankr. E.D. Va. 2012) (section 363(f) sales must reflect the tenant protections afforded by section 365(h)); In re Haskell L.P., 321 B.R. 1 (Bankr. D. Mass. 2005) (same).

In relevant part, section 365(h) states:

(h)(1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and . . .

(ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

The interrelationship, if any, between sections 363(f) and 365(h), is an issue

I need not resolve upon these facts, and not because the trustee has not rejected the leases

at issue.[27]   Section 365(h) applies only to those lessees who hold unexpired valid leases,

and then the statute permits the lessee to remain in possession for the balance of the lease

term in accordance with lease and applicable non-bankruptcy law.  See In re Scharp, 463

B.R. 123, 133 (Bankr. C.D. Ill. 2011):

> The statute very carefully qualifies that "the lessee may retain
> its rights under such lease . . . to the extent that such rights are
> enforceable under applicable nonbankruptcy law." 11 U.S.C.
> § 365(h)(1)(A)(ii).  As indicated above, this provision
> preserves but does not enhance a tenant's rights, which are
> defined by state law.  If the circumstances are such that the
> tenant would have lost its tenancy under state law, the
> intervening bankruptcy of its landlord does not alter this
> result.

Where, as in this instance, the validity of the leasehold interests themselves

are very doubtful, involving two units rented to another entity and individual, as well as

one unit not included in any lease, where the purported lessees may not have paid any or

all rent due, when none of the purported leases were ever disclosed by the debtor on its

bankruptcy schedules or requisite amendments upon conversion, when some units are

omitted in its June 2011 amended disclosure statement, where the leases themselves

contain a provision that, upon non-payment of rent, the trustee can terminate them at his

option, see Village Beer & Beverage, Inc. v. Vernon D. Cox & Co., Inc., 327 Pa. Super.

at 108, and when these purported leases are in favor of the lessor's principal and an

affiliated entity, see generally Pepper v. Litton, 308 U.S. 295, 308 (1939) (bankruptcy

---

[27]Section 365(d)(1) only provides for the "deemed rejection" of residential and
personal property leases in chapter 7 cases.

courts should carefully scrutinize insider claims), any protections under section

365(h)(1)(A)(ii) that are generally afforded lessees of unexpired leases upon lease

rejection are inapplicable.  See generally In re Realia, Inc., 2012 WL 833372, at *9

(B.A.P. 9th Cir. Mar. 13, 2012).

      Accordingly, the trustee can sell the Foremost Building free and clear of the

alleged leasehold interests of Mr. DeFeo and IAS pursuant to section 363(f)(4).  The

value, if any, of the disputed leasehold interests asserted by Mr. DeFeo and/or IAS that

have been divested by the trustee's sale can be raised against the sale proceeds, subject to

all defenses and with the same priority that existed prior to the sale.  See In re MMH

Automotive Group, LLC, 385 B.R. at 372.[28]


VI.


      In sum, the only objections to the trustee's proposed sale of the Foremost

Building were raised by the debtor, the debtor's principal, and an affiliated entity

controlled by the principal.  No other creditor or party in interest has challenged the

reasonableness of this sale.

      After listening to testimony offered over five days, reviewing the many

exhibits and considering the arguments and post-hearing submissions, I find that the

trustee's proposed sale for $4 million is fair and reasonable and entered into in good faith,

when coupled with the agreement of Ciena to carve out almost $470,000 from the sale

---

[28]Mr. DeFeo's pro se objection, dated August 14, 2013, seems to request such
relief if the trustee's motion to sell were granted.  See docket entry #480, at 4.

60

proceeds otherwise payable to that secured creditor.  The trustee's proposed compromise of his prospective section 506(c) claim is also reasonable.

The trustee will be authorized to distribute certain of the sale proceeds as set forth in an order accompanying this memorandum.

Finally, the sale will be free and clear of all interests against the debtor's property, including the purported leasehold interests of Peter DeFeo and International Arts Studio, but excluding the leasehold interests of other tenants to whom no notice of the trustee's motion was given.  Accordingly, Mr. DeFeo and IAS will have to vacate the Foremost Building promptly.

An appropriate order will be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: September 16, 2013